**FILED**

MAR **2 5** 2019

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
CAPE GIRARDEAU

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

IN THE MATTER OF AN APPLICATION          )
OF THE UNITED STATES OF AMERICA          )
FOR A WARRANT TO OBTAIN RECORDS,         )
LOCATION INFORMATION, INCLUDING          )
PRECISION LOCATION INFORMATION,          )          No. 1:19 MJ 4093 ACL
CELL SITE INFORMATION, AND OTHER         )
SIGNALING INFORMATION ASSOCIATED         )          Filed Under Seal
WITH THE AT&T CELLULAR TELEPHONE         )
HAVING THE NUMBER (573) 450-6968, with   )
IMSI NUMBER 310410161920981.             )

## AFFIDAVIT

Timothy Miller, being duly sworn, deposes and says that he is a Special Agent with the

Bureau of Alcohol, Tobacco, Firearms and Explosives ("BATFE"), duly appointed according to

law and acting as such.

### Introduction

That I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives

(BATFE), and have been so employed since November 8, 2016.   I have a Bachelor of Science

degree in Psychology from Southeast Missouri State University and have received approximately

27 weeks of advanced law enforcement training at the Federal Law Enforcement Training Center

in Glynco, Georgia.   Prior to my employment with ATF, I was a Police Officer in the City of Cape

Girardeau, Missouri for 5 years.   I also served in the Missouri Army National Guard as a Military

Police Officer. I have performed Military Police duties in Europe, Afghanistan and the Continental

United States. I have conducted numerous investigations involving violations of the Gun Control

Act of 1968 and related criminal laws. My duties include the investigation of federal criminal

violations by individuals prohibited from possessing firearms.

The facts alleged in this affidavit come from my own investigation, my training and experience, and information obtained from other investigators and witnesses. As this affidavit is submitted for the limited purpose of establishing probable cause to locate and monitor the location of a cellular telephone as part of a criminal investigation, it does not set forth all of the my knowledge regarding this matter.

Upon information and belief, and as explained in greater detail below, the cellular telephone bearing number (573) 450-6968 (hereinafter the **"subject cellular telephone"**), which is being serviced by AT&T (hereinafter referred to as "the Service Provider"), has been used, and is presently being used by Demetrius MURRAY who is conspiring with Lamarcus Williams, Jodie Murry, Hernandez Evans, Demetric McCauley and others unknown to commit violations of Title 18, United States Code, Sections 1958(a) and 1959(a), Use of Interstate Commerce Facilities in the Commission of Murder for Hire and Violent Crimes in Aid of Racketeering Activities, respectively.

The present affidavit is being submitted in connection with an application of the Government for a warrant and order authorizing agents/officers of the investigative agency(ies), and other authorized federal/state/local law enforcement agencies, to obtain location information, including precision location information, cell site location information, and other signaling information, including pen register information, in an effort to locate and monitor the location of the **subject cellular telephone**.

Your affiant further states that there is probable cause to believe that the location information associated with the **subject cellular telephone** will assist the officers in locating MURRAY if he takes further substantial steps which would facilitate the murder of Cornelius Perkins, Antoine Applewhite or Jay'den Marks.

## Investigation and Probable Cause

BATFE is currently conducting an investigation that targets members affiliated with a nation-wide criminal street gang called the Gangster Disciples. The Gangster Disciples are a highly organized national gang active in more than 35 states. The scope of the Gangster Disciples' crimes is wide-ranging and consistent throughout its national operation. The gang protects its power through threats, intimidation, and violence, including murder, attempted murder, assault and obstruction of justice. The Gangster Disciples promotes its enterprise through member-only activities and provides financial and other support to members charged with or incarcerated for gang-related offenses or who are fugitives from law enforcement.

Members and associates of the Gangster Disciples are subject to a strict code of discipline and are routinely fined, beaten, and even murdered for failing to follow the gang's rules. "Enforcers" within the enterprise ensure that members who violate the strict rules of the enterprise are appropriately punished. Agents have identified Larry HOOVER as the national head of the Gangster Disciple organization. According to multiple confidential sources, as well as other law enforcement personnel, HOOVER, who is currently incarcerated in a "Supermax" Federal Bureau of Prisons (BOP) facility located in Florence, Colorado, manages and controls the criminal enterprise of the Gangster Disciples through his "appointment" of the gang's national board members. The board members of the Gangster Disciples are responsible for the management of large multi-state territories and assign/"appoint" a structured hierarchy of officials. The hierarchy of officials are a "Governor" and an "Assistant Governor" for each state, and then "Regents" for certain areas within each state. Other members are referred to as "outstanding members." These appointed officials manage street-level criminal operations and carry out acts of violence when instructed throughout their assigned states and areas.

Currently, the investigation is locally focused on Daryl WHEELER, aka: Shorty Long. WHEELER currently holds the position of "Governor of Governors." WHEELER is known engage in narcotics trafficking, specifically heroin, to southeast Missouri. WHEELER, in the past, has also engaged in cigarette trafficking, moving legally purchased cigarettes from Missouri to Chicago, Illinois. Transport of cigarettes to Illinois without proper licensing is illegal according to federal and Illinois statutes. Persons smuggle cigarettes from Missouri to Illinois because the price of cigarettes in Missouri is much lower than the prices in Illinois, due to the difference in state cigarette tax rates.

Your affiant, as well as other personnel assigned to the ATF Cape Girardeau Field Office, received information concerning the illegal drug trafficking activities of WHEELER and his associates, as well as activity committed by members of the Gangster Disciples, from an ATF confidential informant, hereinafter referred to as CI-1. Currently, CI-1 has been providing reliable information to ATF regarding WHEELER and Gangster Disciples activity since September 2017. CI-1 has cooperated previously with law enforcement and CI-1's current information was corroborated by the investigative team to the extent possible.

CI-1 has a significant criminal history that includes felony convictions: in July 1991, a felony conviction for distribution of a controlled substance, in April 1997, a felony conviction for aggravated robbery and robbery, in October 1997, a felony conviction for distribution of a controlled substance, and in July 2004, a felony conviction for nonsupport in excess of $5,000.00. CI-1 is seeking and receiving subsistence for his/her cooperation. At the direction of investigators, CI-1 participated in five (5) controlled purchases of heroin from WHEELER, which were video and audio recorded as well as monitored in real time by the investigative team.

After the initial controlled purchases of heroin from WHEELER which occurred in

September 2017, the investigative team became aware of false statements provided by CI-1. On September 25, 2017, CI-1 conducted a controlled purchase of 22 grams of heroin from an individual identified as Lamin Johnson. This narcotics purchase was arranged by CI-1 through an unwitting individual identified as Cortez Evans. The investigative team asked CI-1 to obtain a telephone number for Johnson, the supplier of the purchased heroin. CI-1 was unable to obtain a phone number for Johnson. Instead, CI-1 provided the investigative team with a telephone number belonging to an individual not involved with the heroin deal and portrayed that number as belonging to Johnson. CI-1 then elicited the assistance of this individual to assist in creating a fictitious explanation as to why "Johnson" utilized the number. In fact, Johnson never used the number. The individual exploited by CI-1 believed he was assisting CI-1 in a rouse to appease a person involved in an extra-marital affair with CI-1.

CI-1 also provided false information on another Gangster Disciple member Earnest Wilson, AKA: "Don Smokey". Wilson, who is currently deceased but living at the time of this instance, was known by the investigative team as a high-ranking, national Board Member of the Gangster Disciples living in Chicago, Illinois. CI-1 fabricated text messages and phone conversations, portraying communication with Wilson when in fact he/she was not. The investigative team became aware of CI-1 creating these false conversations and confronted him/her about the messages and calls.

When confronted, CI-1 admitted to creating the fictitious calls and text messages to Lamin Johnson and Earnest Wilson. The investigative team believes CI-1 generated these texts to and from Wilson through use of a "burner" app. (Affiant's note: Burner apps allow individuals to create new or use existing phone numbers over the internet. The app then allows the user to create "conversations" or "calls" from a single phone and have it appear as traditional text

messages or phone calls.) CI-1 generated fictitious text messages alluding to a debt or fine he/she owed to Wilson. As a result, the investigative team paid CI-1 monetary subsistence in order to reconcile the debt. The investigative team believes CI-1 fabricated calls and texts messages with Earnest Wilson to garner status and worth in the eyes of the investigative team by showing that he/she direct communication with a national Board Member. The investigative team also believes the false messages created by CI-1 were used to obtain additional funds from the investigative team.

Once it was determined that CI-1 was deceptive with the investigative team, BATFE immediately deactivated CI-1 as a Confidential Informant.

CI-1 remained adamant that any phone conversations, contacts or arrangements made with WHEELER, for the purpose of arranging controlled purchases of heroin, were done so legitimately. The investigative team, to date, does not have any information to contradict this statement made by CI-1. Currently, there is no indication that CI-1 provided false or misleading information regarding WHEELER or other targets of this investigation.

Following the deactivation of CI-1, CI-1 continued to contact the investigative team regarding the narcotics trafficking activity of WHEELER in addition to violent crimes committed by other southeast Missouri based Gangster Disciple members.   Any information provided by CI-1 after September 2017 was scrutinized and only considered reliable after validation through other means and sources.

In May 2018, CI-1 was debriefed by ATF regarding the information he/she provided on a homicide that took place in Bridgeton, MO, April 28, 2018. CI-1 offered information relevant to the shooting and provided first-hand accounts of conversations he/she had on April 29, 2018 with Gangster Disciple members present during the shooting. CI-1 relayed that these individuals

claimed to have actively participated in the shooting, telling CI-1 that bullets fired from their guns hit two of the three victims during the assault, one being the homicide victim. Agents made contact with Bridgeton Police Department and confirmed that the Gangster Disciple members CI-1 spoke with on April 29, 2018, were believed to be present during the homicide. After this incident, the investigative team learned that these same Gangster Disciple members were involved in a shooting in Cape Girardeau, MO in June 2018. CI-1 provided the investigative team phone numbers for these individuals and indicated that he/she could contact each directly. CI-1 was reactivated by ATF as a confidential source in October 2018 to assist the investigative team's investigation into the violent crimes committed by these Gangster Disciple members in Bridgeton and Cape Girardeau, MO.

Since being reactivated, CI-1 has provided information about the members, rank and structure of Gangster Disciple members in southeast Missouri and the narcotic distribution of WHEELER.   CI-1 has also participated in several controlled purchases of heroin from WHEELER and his associates that have been closely monitored and recorded by investigators. Information provided by CI-1 has also been corroborated by investigative means and sources to include, but not limited to: analysis of telephone toll records and pen registers, confirmation of recorded and/or monitored calls in which CI-1 participated in to toll and pen register records, review of undercover audio and video recordings of Gangster Disciple meetings attended by CI-1 and review of undercover audio and video of recordings made by the investigative team during controlled purchases made by CI-1. This also includes conversations with other investigators regarding the intelligence gained from their national Gangster Disciple investigations both historical and present day. In addition, the investigative team compared and validated information from CI-1 to intelligence and information obtained from various correctional facility

investigators on the activity of documented Gangster Disciple inmates. This information has not been found to be false or misleading.

On February 8, 2019, Wheeler agreed to sell heroin to CI-1, but could not make the delivery, because Wheeler was restricted to his home due to being on electronic monitoring by the Cook County Sheriff's Office as a condition of bond in an unrelated driving offense. Instead of delivering the heroin himself, Wheeler directed Carter Harris to make the delivery in Charleston, Missouri. Harris made that delivery.   Investigative officers monitored and recorded the transaction.

On February 23, 2019, Wheeler agreed to sell heroin to CI-1, but could not make the delivery, because Wheeler was still on electronic monitoring. Instead of delivering the heroin himself, Wheeler directed Leslie Barnes to make the delivery in Charleston, Missouri. Barnes made that delivery.   Investigative officers monitored and recorded the transaction.

CI-1 knows that Wheeler sells cigarettes smuggled from Missouri in Illinois as a means of making money. CI-1 has furnished cigarettes purchased in Missouri to Wheeler for resale in Illinois on occasions before CI-1 became a confidential informant.

The above information is disclosed to demonstrate that Wheeler, and his associates in the Gangster Disciples, engage in a pattern of racketeering activity as defined by Title 18, United States Code, Sections 1959 and 1961(5), and that the transactions involved transfers of contraband between Missouri and Illinois.

On February 18, 2019, at approximately 11:45 p.m., the Sikeston Department of Public Safety responded to a shooting incident that resulted in the death of Marcus Dixon within the city limits of Sikeston, Missouri, which is also within the Eastern District of Missouri in the

Southeastern Division. Officers went to the reported scene of Dixon's death, the corner of William and Branum Streets, and found Dixon dead of multiple gunshot wounds. Officers found and seized at least seven expended ammunition casings at the scene. Dixon was known to be involved in criminal activity, including sales of controlled substances. Dixon's father is Demetrius MURRAY, also known as "Meaty".

CI-1 informed officers of the relationship between Wheeler, MURRAY and the Gangster Disciples, as follows: MURRAY is a known Gangster Disciples member. MURRAY was formerly a "Governor" of the Gangster Disciples, a position of authority over Gangster Disciples members who were located in Southeast Missouri. MURRAY is a close associate of Daryl Wheeler, the "Governor of Governors" of the Gangster Disciples. Wheeler is located in Chicago, Illinois, and exercises control over leadership positions for Gangster Disciples groups in the United States. Wheeler receives reports from Gangster Disciples members and Board Members as to the operations of the Gangster Disciples chapters in the United States. Gangster Disciple members routinely consult with Wheeler after homicides and/or violent crimes against fellow Gangster Disciples members or associates. Gangster Disciple members are expected to retaliate for murders or violent crimes against fellow members.

CI-1 spoke to BATFE agents on February 19, 2019. CI-1 stated that he/she had spoken to Wheeler regarding the death of Marcus Dixon. Wheeler told CI-1 that Wheeler would be sending "his cousins down there to take care of it." This exchange was not monitored by investigators or recorded. CI-1 believed that Wheeler meant that he was sending people to Southeast Missouri to retaliate against the persons who killed Marcus Dixon.

BATFE Special Agent Beth Dallas reviewed records from a pen register currently authorized for the cellular telephone records of Daryl Wheeler. Those records revealed the following communications between CI-1 and Wheeler:

2/19/19, at 1:12 a.m., an incoming call from CI-1 to Wheeler.

2/19/19, at 1:55 a.m., an incoming call from CI-1 to Wheeler.

2/19/19, at 2:55 a.m., an outgoing call to CI-1 from Wheeler.

CI-1 reported that he discussed the murder of Dixon with Wheeler and the steps to be taken to retaliate for Dixon's murder. These exchanges were also not monitored by investigators or recorded.

On February 19, 2019, CI-1 received a message through Facebook from Jodie Murry. CI-1 has known Murry for years. CI-1 has informed BATFE Agents that Jodie Murry is a designated "Enforcer" for the Gangster Disciple Street Gang and that Murry is responsible for multiple murders in Chicago, Illinois. The Facebook message from Murry to CI-1 requested that CI-1 call Murry. CI-1 opened the message on his/her cellular device and showed the message to your affiant. The message was from a profile using the name "Jodie Murry" and requested that CI-1 contact the message sender at phone number 312-479-6838.   BATFE Special Agent Beth Dallas requested and obtained subscriber information in reference to phone number 312-479-6838 and observed the subscribed subject for the phone number was "Jodle (sic) Murry. On the same date, CI-1 attempted to place a telephone call Murry. Your affiant was physically present with CI-1 for this attempted call and observed CI-1 dial 312-479-6838. The call was not answered. At 10:54 a.m. on the same date, Murry called CI-1. Your affiant was present with CI-1 and observed phone number 312-479-6838 was attempting to contact CI-1's device. The call malfunctioned when CI-1 answered. CI-1 immediately returned the call to Murry. Your affiant was physically present with CI-1 when the

call was dialed and observed CI-1 dial 312-479-6838. Your affiant also recorded the call using a digital recorder. Murry stated to CI-1 that Murry would be in town soon and that he "needed a couple of "throwaways". CI-1 understood the term "throwaway" to mean a firearm that could be disposed of after committing a crime by using that firearm. Your affiant, based on experience, also has that understanding of that use of the word "throwaway."

CI-1 believed, and conveyed to your affiant, that Jodie Murry was going to come to Sikeston to kill the person who killed Dixon. CI-1 based his belief on his February 19, 2019 phone contacts with Wheeler and the subsequent contact with Murry, who had requested that CI-1 furnish him (Murry) with firearms. CI-1 believed that Wheeler would order retaliation against the killer of Dixon due to Demetrius MURRAY's long association as a Gangster Disciple member and due to MURRAY and Wheeler's friendship.

On February 19, 2019, at approximately 11:09 a.m., your affiant was physically present with CI-1, when CI-1 placed to Demetrius MURRAY at the **subject cellular telephone**. CI-1 has known MURRAY for several years and knew his telephone number. Your affiant monitored and recorded the call. (Affiant would later speak with MURRAY in person and recognized MURRAY's voice as being the same as the person on the phone call with CS-1) CI-1 discussed with MURRAY that Jodie Murry was coming to Southeast Missouri from Chicago and that Murry had requested a couple of "throwaways". MURRAY told CI-1 that he planned to travel to Chicago on Thursday, February 21, 2019, and that he would bring Jodie Murry back to Southeast Missouri on Friday, February 22, 2019. Demetrius MURRAY further explained to CI-1 that he (MURRAY) was torn about doing this, that the people who MURRAY believed killed Dixon are only 17 and 19 years old, and that "these are babies". CI-1 believed that MURRAY was stating that he was not comfortable with having the young men killed who were suspected of killing Dixon.

At the conclusion of the call with MURRAY, your affiant asked CI-1 what would motivate MURRAY to participate in a crime that he was not comfortable committing. CI-1 replied that MURRAY would receive pressure from associates and "...the streets" to retaliate against any person involved in his son's murder. CI-1 further stated that the sole purpose of MURRAY bringing Jodie Murry to Southeast Missouri would be to perpetrate a violent retaliatory act against the person or persons responsible for killing his son, Marcus Dixon.

Your affiant knows that in the early stages of the Dixon murder investigation the Sikeston Department of Public Safety developed information from local informants, which indicated that Jay'den Jayvon Marks, aka "Pico", was involved in Dixon's murder. Marks was born on October 4, 2001, and would be 17 years old. Marks, as of this date, has been interviewed by law enforcement but has not been charged with any crimes related to Dixon's murder.

On February 22, 2019 at approximately 3:02 P.M., MURRAY received a phone call on the **subject cellular telephone** from an inmate at the Eastern Reception and Diagnostic Correctional Center (ERDCC) located in Bonne Terre, Missouri.   It should be noted that all calls placed by Missouri Department of Corrections inmates are subject to live monitoring and recorded for later review, if necessary. The numbers dialed by inmates are also recorded and that information is included with the call audio. Inmates and the person called are advised of the potential for monitoring and recording prior to speaking with one another. The inmate and the contacted person are also reminded periodically, via automated voice message, that the calls are monitored and recorded. The inmate, Lamarcus Williams a/k/a "Manny", identified himself to MURRAY and told MURRAY he called because he had heard about Dixon's murder. MURRAY indicated to Williams that he (MURRAY) had learned the identity of his son's killer and referred to him by his nickname, "K2." MURRAY also stated he suspects a current inmate at the Scott County, Missouri

jail, Antoine Applewhite, may have put "K2" on a "mission" to kill Dixon. Applewhite is currently incarcerated at the Scott County jail pending the adjudication of a murder case in which Applewhite is the accused. MURRAY stated that his son, Dixon, was "out there" when Applewhite committed the crime, indicating Marcus Dixon witnessed Applewhite murder the victim.

Although MURRAY stated he is confident Marcus Dixon did not cooperate with Police, MURRAY suspects Applewhite wanted Dixon to be killed based on what Dixon saw the night Applewhite committed the murder for which he is charged.

MURRAY made clear that he intends on learning the facts surrounding Dixon's murder, stating, "…I'm trying to wait to see you understand before I, you know what I mean…"

Williams replied to MURRAY, stating, "K2" can "get got up on." Your affiant understands Williams' statement to mean that "K2" would be a target for a violent assault that may cause death if he was sent to prison.

MURRAY replied to Williams, stating, "Easy easy you know what I'm saying? And I wanna know, I wanna know who pushed the button bro, you understand me, because dude, dude could have, that could have been over yesterday. You understand I mean, I just wanna know who pushed the mother fucking button bro, I gotta, if it's dude, you know what I'm saying then I mean I gotta see dude too…" Your affiant understands this statement to mean that MURRAY is confident the "K2" subject, should he be sent to prison, will be killed. MURRAY, further, is stating that he wants to know who, if anyone, ordered Dixon's killing and if MURRAY determines Applewhite did as such, then Applewhite will be targeted for a violent assault as well.

MURRAY also told Williams that he has received multiple phone calls from multiple subjects who have told MURRAY that they will assist MURRAY with retaliation when MURRAY determines retaliation is necessary. MURRAY stated, "I've gotta have a million mother fuckers

hit my line like 'Meat man I got you, we got you.' I'm like 'No, I gotta find out, I gotta find out'
you know what I'm saying."

On February 22, 2019 at approximately 6:10 P.M., MURRAY received a call on **subject
cellular telephone** from an inmate at the Northeast Correctional Center located in Bowling Green,
Missouri. The inmate, Hernandez Evans a/k/a "Julio" a/k/a "Montana" began to speak with
MURRAY and MURRAY advised him that the "K2" subject killed Dixon. Evans indicated to
MURRAY that he knows the "K2" subject personally and stated, "…he just need some
guidance…" to which MURRAY replied, "…that ain't what he needs now man for real." Evans
replied to MURRAY, "Yea, Yea I'm hip." Your affiant knows that the phrase "I'm hip" is another
way of stating "I Understand." MURRAY then made a statement which indicates to your affiant
that he did not want to discuss any further on the recorded prison line. "We ain't gotta say no more
man, get on top of that." Your affiant believes MURRAY, by stating "…that ain't what he needs
now…" and "get on top of that", is advising Evans to arrange for the "K2" subject to be retaliated
against once he is placed into a prison.

On February 22, 2019 at approximately 8:16 P.M., MURRAY received a call on **subject
cellular telephone** from Lamarcus Williams, the previously mentioned inmate incarcerated at the
Eastern Reception and Diagnostic Correctional Center in Bonne Terre, Missouri. Williams asked
MURRAY if he was "alright" to which MURRAY responded, "…I can't really talk on your phone
you already know why." Your affiant believes that, again, MURRAY did not want to discuss the
topic any further on the recorded prison line.

On February 22, 2019, BATFE Agents became aware that Jodie Murry was traveling to
Southeast Missouri from Chicago via Amtrak train. BATFE Special Agent Dallas observed Murry
when he arrived at the train station in Carbondale, Illinois on February 23, 2019 at approximately

1:19 A.M. BATFE Special Agent Dallas also observed, both physically and via phone records, Jodie Murry using his cellular phone to place phone calls to Demetrius MURRAY at the **subject cellular telephone** number.

Between the time of Dixon's murder and February 22, 2019, the Sikeston Department of Public Safety developed information that Cornelius Perkins a/k/a "K2" was responsible for killing Marcus Dixon. Law enforcement contacted Perkins in Charleston, Missouri on February 23, 2019 and took him into custody at approximately 1:27 A.M for unlawful firearm possession.

On February 23, 2019 at approximately 1:56 P.M., your affiant monitored a phone call between CI-1 and Murry. Your affiant was not physically present with CI-1 for the phone call; however, CI-1 used the "conference" feature available on his/her cellular telephone in order to allow your affiant to hear the conversation between CI-1 and Murry. Your affiant also observed the call from CI-1 in phone records obtained in reference to Murry's phone number, 312-479-6838. CI-1 asked Jodie Murry what he intended to do during his stay in Southeast Missouri, particularly since the Perkins subject was in Police custody. Murry stated that "Police justice" was not sufficient and stated he intended on exacting "get your ass shot justice" while he was in Southeast Missouri. Murry also mentioned a party that was to be held in New Madrid County, Missouri the evening of February 23, 2019 and stated would "shoot that bitch up" and that there "ain't no partying going on until I get justice for my man." Murry continued, stating, "But like, I feel like G, somebody's fixing to get it, somebody's gotta get it before I leave. I'm the type of person, I'm the type of person when I do it for somebody I'm not gonna leave I'm gonna stay up there because I'm not gonna leave ya'll in no situation, I'm gonna stay up here."

In response to the above-described threat, your affiant, along with other BATFE Special Agents, BATFE Task Force Officers and other local law enforcement agencies participated in a

multi-agency operation dedicated to locating Jodie Murry and preventing him from perpetrating any violent acts.

On February 23, 2018 at approximately 6:30 P.M., your affiant and BATFE Task Force Officer (Sikeston Department of Public Safety) Robert Dees made contact with MURRAY at his residence, 902 Montgomery, Sikeston, Missouri 63801. MURRAY invited your affiant and Task Force Officer Dees into his residence. Task Force Officer Dees informed MURRAY that he (Dees) wished to provide MURRAY with information related to his son's murder. MURRAY, without any prompt or suggestion from the investigators, spontaneously stated that if he wanted to have the suspect killed, he could have made it happen. MURRAY also, later in the conversation, stated that he had a very close relationship with a man from Chicago named Earnest Wilson. MURRAY advised that Wilson was the former "GD Chief." MURRAY stated he had hosted Wilson in Sikeston, Missouri multiple times before Wilson's death in May 2018 and further stated that people in the Sikeston, Missouri area look to him (MURRAY) as worthy of emulation, in part, because of his connection to Wilson. Your affiant knows that Earnest Wilson a/k/a "Don Smokey" is a now deceased former board member for the Gangster Disciple Organization. CI-1, during a September 2017 interview with your affiant, stated Earnest Wilson demanded that members participated in multiple types of illegal activity, which included the distribution of controlled substances, cigarette trafficking, firearms trafficking and acts of violence to include murder. MURRAY also stated to your affiant and Task Force Officer Dees that he suspects Jay'den Marks played a role in Marcus Dixon's murder. Your affiant and Task Force Officer Dees did not make contact with or observe Jodie Murry during the above-described contact with MURRAY.

Jodie Murry was located during a traffic stop in Sikeston, Missouri in MURRAY's Mercedes passenger car with Demetrius MURRAY shortly before midnight on February 23, 2019.

Your affiant spoke with Demetrius MURRAY, again, during the traffic stop. During that conversation, MURRAY advised your affiant that he had purchased Jodie Murry's train ticket and picked him up at the train station on February 22, 2019. MURRAY denied having any violent retaliatory intentions.

BATFE and additional law enforcement conducted constant surveillance of Murry until February 26, 2018 at approximately 4:15 P.M., when Murry boarded an Amtrak train in Carbondale, Illinois, bound for Chicago, Illinois.   BATFE Agents observed Demetrius MURRAY drive Jodie Murry to the train station.

On February 25, 2019 at approximately 6:01 P.M., MURRAY received a call on **subject cellular telephone** from Demetric McCauley, an inmate incarcerated at the Eastern Reception and Diagnostic Correctional Center in Bonne Terre, Missouri. Demetric McCauley is validated and documented by the Missouri Department of Corrections as a Gangster Disciple. MURRAY stated to McCauley that Cornelius Perkins was taken into custody in reference to unlawful firearm possession. MURRAY further stated that he knows Perkins is "on parole" and that "He's got to come back through there." Your affiant spoke with Missouri Department of Corrections Investigator Michael McGill in reference to MURRAY's statement above. Investigator McGill advised that the Eastern Reception and Diagnostic Correctional Center in Bonne Terre, Missouri is the intake facility for male offenders committed by the courts in eastern Missouri. Charleston, Missouri is located in Mississippi County, Missouri. Male offenders convicted of crimes or who are subject to parole violation in Mississippi County, Missouri are first sent to the Eastern Reception and Diagnostic Correctional Center for evaluation prior to placement in a permanent facility. Your affiant believes that MURRAY is conveying to McCauley that Perkins will be sent to the prison in which McCauley is currently incarcerated. Later in the call McCauley asks

MURRAY if he (MURRAY) wants McCauley to provide "A and A" and further states "I can aid you." Throughout the course of this investigation, your affiant has received and reviewed Gangster Disciple documents seized by various law enforcement agencies. Your affiant knows through reading the documents that the Gangster Disciples have established a code of "violations", which can be described as rules that members must follow in order to remain in good standing with the organization. Your affiant knows, based on the content of the documents, that all members are required to "…aid and assist one another in righteous endeavors." MURRAY replied to McCauley, stating, "Bro listen man, bro listen, my love for you is so great bro, I would never put you in that predicament man. And I understand, so I mean, you know how that go, it, it will work itself out…" MURRAY continued, stating, "It will work itself out, you know me man."

On February 28, 2019 at approximately 7:20 P.M., MURRAY received another call on **subject cellular telephone** from Demetric McCauley, from the Eastern Reception and Diagnostic Correctional Center in Bonne Terre, Missouri. MURRAY stated to McCauley that he suspects Marcus Dixon's murder was ordered by Antoine Applewhite. MURRAY stated to McCauley that law enforcement is unaware of Applewhite's involvement in Dixon's murder; however, MURRAY further stated that he is not going to inform law enforcement about Applewhite's potential involvement.

Your affiant knows, based on experience with this investigation that MURRAY travels to Chicago regularly. Your affiant knows that Daryl Wheeler maintains possession of a Mercedes passenger car in Chicago, Illinois that bears a Missouri license plate registered to Demetrius MURRAY. Your affiant also knows that MURRAY visited Wheeler in Chicago during the first week of February 2019 and had contact with Jodie Murry during that same visit. MURRAY posted a photograph of himself and Jodie Murry on his Facebook profile page on February 3, 2019 with

the comment "God first, family second, because money don't last.  #CHI CITY!" Your affiant knows the city of Chicago is often referred to as the "Chi."

Your affiant has also requested Missouri Department of Corrections visitor logs in reference to Demetrius MURRAY. Your affiant observed that MURRAY visited Demetric McCauley at the Eastern Reception and Diagnostic Correctional Center on November 11, 2018, October 7, 2018, August 19, 2018, July 15, 2018 and June 24, 2018. Your affiant spoke with Missouri Department of Corrections Investigator Michael McGill. Investigator McGill advised that it is common for visitors to pass contraband to inmates during in-person visits. Investigator McGill also informed your affiant that visitors often convey messages of criminal nature to inmates during the visits in order to avoid speaking the criminal message on a recorded prison phone line.

On March 17, 2019, Demetrius MURRAY visited Demetric McCauley, the aforementioned inmate incarcerated at the Missouri Department of Corrections facility in Bonne Terre, Missouri.  Department of Corrections personnel placed McCauley and MURRAY into a booth, commonly referred to as a "no contact booth" for the visit.  The "no contact booth" is a room which allows for inmates to speak over a telephone to a visitor and observe that visitor through a window.   The booth; however, does not allow for physical contact between the inmate and the visitor.  The booth also contains a recording device that captures the visitors' end of the conversation.  Your affiant spoke with the Missouri Department of Corrections Investigator assigned to the Bonne Terre, Missouri facility on March 18, 2019.  The MODOC investigator advised MURRAY stated that "they" (law enforcement) must have suspected that he (MURRAY) was going to "talk about dude."  Your affiant believes that the word "dude" is a reference to Cornelius Perkins.  The MODOC investigator at Bonne Terre estimated that the visit took approximately fifteen (15) minutes.  The MODOC investigator further advised that prior to his

departure, MURRAY asked McCauley to notify him when he (McCauley) would be allowed to visit outside of the "no contact booth."

I requested information from AT&T regarding the service to the **subject telephone number.**  AT&T confirmed that AT&T provides the service to the **subject telephone number,** that the subscriber to that telephone number is Demetrius MURRY (sic), with an address of 1334 W. Murray Lane, Sikeston, Missouri 63801 and that the IMSI number for the **subject telephone number** is 310410161920981.   MURRAY currently lives at 902 Montgomery in Sikeston, Missouri. That address does not match subscriber information relevant to the **subject cellular telephone.** Your affiant knows; however, through experience that subjects involved in criminal activities often subscribe to telephones with fictitious information in an attempt to thwart law enforcement investigations of their illegal activities.

The investigation has demonstrated that the **subject cellular telephone** is being used by Demetrius MURRAY, who, because of his status, history and connection to the Gangster Disciple Organization, is able to and is actively conspiring to murder those subjects he determines are responsible for the death of his son, Marcus Dixon, in violation of Title 18, United States Code, Sections 1958(a) and 1959(a).

Although both subjects believed to be responsible for the murder of Dixon are currently incarcerated, the evidence indicates that MURRAY is actively seeking to retaliate against them. Investigators are also concerned that MURRAY may seek to retaliate against other subjects not currently known to law enforcement. Therefore, it is critical that the investigative team be able to monitor the movements of the **subject cellular telephone** thereby assisting in the determining MURRAY's location. Your affiant believes that the requested authorization would be a valuable asset in achieving the overall goals of the investigation.

## Investigative Considerations and Techniques

Based on my knowledge, training, and experience, as well as information provided by investigators with specialized experience relating to cellular telephone technology, I am aware of the following facts and considerations:

A.     Wireless phone providers typically generate and retain certain transactional information about the use of each telephone call, voicemail, and text message on their system. Such information can include log files and messaging logs showing all activity on a particular account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or other addressing information associated with particular telephone calls, voicemail messages, and text or multimedia messages.

B.     Wireless phone providers also typically generate and retain information about the location in which a particular communication was transmitted or received. For example, when a cellular device is used to make or receive a call, text message or other communication, the wireless phone provider will typically generate and maintain a record of which cell tower(s) was/were used to process that contact. Wireless providers maintain information, including the corresponding cell towers (i.e., tower covering specific geographic areas), sectors (i.e., faces of the towers), and other signaling data as part of their regularly conducted business activities. Typically, wireless providers maintain records of the cell tower information associated with the beginning and end of a call.

C.     Because cellular devices generally attempt to communicate with the closest cell tower available, cell site location information from a wireless phone provider allows investigators to identify an approximate geographic location from which a communication with a particular cellular device originated or was received.

D.      Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers.

E.      Wireless providers also maintain business records and subscriber information for particular accounts. This information could include the subscriber's full name and address, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscriber's Social Security Number and date of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscriber. In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the dates and

times of payments and the means and source of payment (including any credit card or bank account number).

      F.    Providers of cellular telephone service also typically have technical capabilities that allow them to collect and generate more precise location information than that provided by cell site location records. This information is sometimes referred to as E-911 phase II data, GPS data or latitude-longitude data. In the Eastern District of Missouri, such information is often referred to as "precision location information" or "PLI" data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by attempting to triangulate the device's signal using data from several of the provider's cell towers. Depending on the capabilities of the particular phone and provider, E-911 data can sometimes provide precise information related to the location of a cellular device.

      In order to locate the **subject cellular telephone** and monitor the movements of the phone, the investigative agency(ies), and other authorized federal/state/local law enforcement agencies, may need to employ one or more techniques described in this affidavit and in the application of the government. The investigative agency(ies), and other authorized federal/state/local law enforcement agencies, may seek a warrant to compel the Service Provider, any telecommunication service providers reflected in Attachment 1, to include providers of any type of wire and/or electronic communications   (herein incorporated by reference), and any other applicable service providers, to provide precision location information, including Global Position System information (if available), transactional records, including cell site location information, and pen register and trap-and-trace data.

      None of the investigative techniques that may be employed as a result of the present application and affidavit require a physical intrusion into a private space or a physical trespass.

Electronic surveillance techniques such as pen register and cell site location monitoring typically have not been limited to daytime use only. Furthermore, the criminal conduct being investigated is not limited to the daytime. Therefore, the fact that the present application requests a warrant based on probable cause should not limit the use of the requested investigative techniques to daytime use only. Accordingly, the investigative agency(ies), and other authorized federal/state/local law enforcement agencies, request the ability to employ these investigative techniques at any time, day or night.

The monitoring of the location of the **subject cellular telephone** by one of the methods described herein will begin within ten (10) days of the date of issuance of the requested Warrant and Order.

**Conclusion**

Based on the above information, there is probable cause to believe that the **subject cellular telephone** is being used by Demetrius MURRAY, who is conspiring to commit violations of Title 18, United States Code, Sections 1958(a) and 1959(a), and whose whereabouts are currently unknown. There is likewise probable cause to conclude that locating and monitoring the movements of the **subject cellular telephone** will assist investigators in preventing further acts of violence, up to and including murder, which would otherwise be retaliatory crimes related to Marcus Dixon's homicide.

_03/25/2019_
DATE

Timothy Miller
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Sworn to and subscribed before me this _25th_ day of March, 2019.

ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE
Eastern District of Missouri